# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAKE CHARLES DIVISION

| | |
|---|---|
| **CECIL SIMMONS** | **CIVIL ACTION NO. 04-1159** |
| **VS.** | **JUDGE MINALDI** |
| **COMMISSIONER OF SOCIAL SECURITY** | **MAGISTRATE JUDGE METHVIN** |

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's unfavorable disability finding. Considering the administrative record, the briefs of the parties and the applicable law, it is recommended that the Commissioner's decision be **AFFIRMED**.

### *Background*

Born on June 19, 1960, Cecil Simmons ("Simmons") is a 45-year-old claimant with an eighth-grade education. (Tr. 8). Simmons has worked in the past as a laborer in the pipeline industry, a logger, and a drywall finisher. (Id.).

On August 15, 2000, Simmons filed an application for disability insurance benefits, alleging disability as of June 9, 1997 due to arthritis of the left hand and a fracture of the left ankle. His application was denied initially and on reconsideration, and an administrative hearing was held on December 19, 2001. In an opinion dated February 21, 2002, the ALJ found that Simmons retains the ability to perform the full range of light work through September 30, 1999, the date he was last insured for disability benefits. (Tr. 13). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner from which Simmons now appeals.

*Assignment of Errors*

Simmons raises four errors on appeal: (1) The ALJ erred in failing to find that Simmons

meets the requirements of Listing 1.03; (2) the ALJ erred in finding that Simmons's upper

extremity deficits do not equal a listing; (3) the ALJ erred in stating that Simmons should have

obtained physical therapy; and (4) the ALJ erred in assessing Simmons's residual functional

capacity.

*Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the

Commissioner's decision is supported by substantial evidence in the record; and (2) whether the

decision comports with relevant legal standards.  Carey v. Apfel, 230 F.3d 131, 136 (5th Cir.

2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232,

236 (5th Cir. 1994).  Substantial evidence is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.  Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292;

Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991).  The court may not reweigh the evidence in

the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of

the evidence does not support the Commissioner's conclusion.  Carey, 230 F.3d at 136; Johnson

v. Bowen , 864 F.2d 340, 343 (5th Cir.1988).  A finding of no substantial evidence is appropriate

only if no credible evidentiary choices or medical findings exist to support the decision.

Johnson, 864 F.2d at 343.

*Analysis*

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1.  If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2.  A person who does not have a "severe impairment" will not be found to be disabled.

3.  A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4.  If a person can still perform his past work, he is not disabled.

5.  If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

In the instant case, the ALJ determined at Step 5 that, although Simmons suffers from the severe impairments of a prior left ankle fracture and mild to moderate impairments of the left upper extremity, he is not disabled because he retains the residual functional capacity to perform the full range of light work. (Tr. 12).

After careful consideration of the record, the undersigned concludes that the ALJ's decision is supported by substantial evidence.

## 1.    <u>Medical History</u>

Simmons seeks benefits for two separate injuries. The first, a workplace injury, occurred on June 9, 1997 while Simmons was working as a logger. While cutting down trees, a tree fell on his left ankle, fracturing it. Simmons was treated at the emergency room immediately

following the injury. An examination showed that the distal tibial metaphysis was fractured, with transarticular extension, separation and avulsion of the medial malleolus. (Tr. 63). Surgery was deferred because of the amount of swelling. (Tr. 85).

Progress Notes from Simmon's treating physician, Dr. Terry Texada, an orthopedist, state that on June 19, 1997, x-rays showed a displaced fracture of the medial malleulus, with no fracture of the tibia. (Tr. 85). On June 23, 1997, Simmons underwent surgery to repair the fracture. (Tr. 84). He was discharged the following day with pain killers. Progress notes dated July 1, 1997 and July 7, 1997 state that Simmons was doing well following the surgery. (Tr. 83). On July 28, 1997, Simmons reported no pain at the fracture site, and Dr. Texada reported that his wounds had healed. (Tr. 82). Notes dated September 15, 1997 state that, three months after his surgery, Simmons seemed to be doing better, with no significant tenderness over the fracture site, however, he was still having some pain when walking. (Tr. 81). X-rays taken on October 21, 1997 showed that the fracture appeared to be healing. (Id.). Although Dr. Texada noted that Simmons was unable to return to work at that time, he estimated that Simmons could be ready to work in four weeks. (Id.).

Notes dated November 18, 1997 state that Simmons was "ambulating much better" but still experiencing pain. Dr. Texada recommended a tomogram to determine whether the fracture was healing properly. (Tr. 80). Notes dated November 25, 1997 state that Simmons's tomogram showed that there "may be a development of a non-union." A repeat surgery was discussed but deferred because Simmons was continuing to improve. (Tr. 79). Notes dated February 3, 1998 state that Simmons was continuing to improve and having less pain. (Tr. 78). In notes dated March 31, 1998, Dr. Texada stated the following:

I think the fracture has healed. He is having some pain with uneven ground, and I think this could be related to the ossification in the deltoid ligament. I would like to continue watching that, and he may need further surgery to remove it. I think vocational rehab would be a good idea with him.

(Tr. 77).

On July 1, 1998, Simmons underwent surgery to remove the hardware that had been put in place during the first surgery. One week later, he was reported to be doing "very well." (Tr. 76). X-rays taken on July 27, 1998 showed that the wound was healing well and that Simmons's left ankle looked good. (Tr. 75). On October 5, 1998, Dr. Texada reported that "I think we have done all we can do with Mr. Simmons. He may have this residual ankle pain." (Tr. 74). In Progress notes dated November 2, 1998, Dr. Texada reported that Simmons had reached maximum medical improvement and released him to work at a light duty status. (Tr. 74).

On October 20-22, 1998, a Functional Capacity Evaluation was completed by Karmen Wolverton, a physical therapist referred by Dr. Texada, for the purpose of determining whether Simmons could return to work. Ms. Wolverton reported that Simmons exhibited a functional range of motion in all extremities; that bilateral grip strength was decreased as compared to norms, but was functional for lifting tasks; and that Simmons reached safe maximums of 30 lbs. with bilateral lifting from floor to shoulder level. (Tr. 125-39). Ms. Wolverton recommended that Simmons be released to light duty work, but that he should not return to his past work as a logger. (Tr. 129).

Simmons's second injury took place on March 14, 2000. Simmons reported that he was walking when his left ankle gave out and he fell forward, catching his left hand in a table saw and lacerating two of the fingers. Simmons was treated at the emergency room immediately

following the injury. An examination showed that he had lacerations and soft tissue swelling, as well as a fractured third finger (middle phalanx distal metaphysis). (Tr. 56).

Dr. Texada examined Simmons's left hand on July 26, 2000 and reported that he had loss of motion of the DIP joint[1] and an ulnar deviation at the tip of the long finger on his left hand, but that he was otherwise "neurovascular intact." (Tr. 73). On January 25, 2001, Dr. Texada reported that although Simmons lacked full flexion at the metacarpophalangeal joint, his flexion was fairly normal at the interphalanegeal joint and DIP. Dr. Texada stated that surgery would not be beneficial. (Tr. 72).

Simmons was examined by Dr. David H. Steiner, an orthopedic surgeon, at the request of Disability Determination Services on May 18, 2001. Dr. Steiner reported that although Simmons had tenderness with the subtalar motion of his left ankle, his plantar flexion was the same as in his right ankle, and both ankle dorsiflexion and plantar motion were normal. (Tr. 86). X-rays showed that the fracture was well-healed, but also showed that there were some abnormalities on the superior distal margin of the calcaneous (heel bone), suggesting changes in the talus (small bone that sits between the heel bone and the two bones of the lower leg (tibia and fibula)). (Tr. 87). Nevertheless, Dr. Steiner reported that Simmons had a normal gait, except for a mild limp on the left side because of his ankle problem. Dr. Steiner further reported that Simmons lacked about 5 degrees of full extension in his left ankle but otherwise had good range of motion. (Id.).

---

[1] The "DIP" joint is the joint near the end of the finger (also called the distal IP joint). The following summary of the anatomy of the hand, taken from www.handuniversity.com, is helpful:

> The finger joints work like hinges when the fingers bend and straighten. The main knuckle joint is the *metacarpophalangeal joint* (MCP). It is formed by the connection of the metacarpal bone in the palm of the hand with the first finger bone, or *proximal phalanx*. Each finger has three phalanges, or small bones, separated by two interphalangeal (IP) joints. The one closest to the MCP (knuckle) is called the PIP, or *proximal IP joint*. The joint near the end of the finger is called the DIP, or *distal IP joint*.

Examination of Simmons's left hand showed some restriction of motion in the MCP joint of the index finger, but there was normal sensation except for some slight sensitivity where the hand was injured with the saw. The long finger had good flexion of the MCP joint, with very limited flexion of the PIP joint and no flexion at the DIP joint. There was no sensation on the tip of the long finger, and Simmons lacked grasping ability in his left hand. (Id.). However, Dr. Steiner noted that Simmons had good grip strength and normal dexterity in his right hand. X-rays of the left hand showed that the DIP joint of the longer finger was arthritic and the ulnar condyle is probably missing. (Tr. 87). Dr. Steiner opined that Simmons "could function at light duty that [doesn't] require significant education." (Tr. 89). After considering all of Simmons's impairments, Dr. Steiner opined that Simmons "could function at light duty that [doesn't] require significant education." (Tr. 89).

On July 24, 2001, Simmons's left hand was examined by Dr. Michael C. Genoff, an orthopedic surgeon with the Louisiana Hand Center, at the request of Dr. Texada. Dr. Genoff reported that Simmons complained of pain and cramping in his left hand, as well as right wrist pain. Dr. Genoff reported some generalized atrophy of Simmons's left middle finger when compared to the right middle finger and some tenderness to palpation of the volar aspect of the left middle finger distal phalanx. The remainder of the finger was non-tender. (Tr. 105). Dr. Genoff reported that Simmons had some hypersensitivity at the left middle finger on the volar surface of the distal phalanx, and that his grip strength in his left hand was 45 lbs. as opposed to 85 lbs. in his right hand. (Tr. 106). Tinel's sign[2] was positive over the ulnar digital nerve in the

---

[2] Tinel's sign is defined by MedicineNet.com as follows:

An examination test that is used by doctors to detect an irritated nerve. Tinel's sign is performed by

left middle finger. (Id.). Following the examination, Dr. Genoff released Simmons to light duty work with the restriction of limited use of his left hand. (Id.).

**2.     Listing 1.03**

In concluding that Simmons is not disabled, the ALJ found that he does not meet the requirements of either Listing 1.04 (arthritis of a major joint in each upper extremity) or Listing 1.11 (fractures of the femur, tibia, tarsal bone, and pelvis). Simmons contends that the ALJ should have considered and found that he meets the requirements of Listing 1.03, which requires the following:

> 1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.03. An "inability to ambulate effectively" is defined in Listing 1.00B2b as follows:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.).

20 CFR Pt. 404, Subpt. P, App. 1.

After consideration of the record, the undersigned concludes that Simmons does not satisfy the requirements of Listing 1.03. Although Simmons has had surgery to repair the

---

lightly banging (percussing) over the nerve to elicit a sensation of tingling or "pins and needles" in the distribution of the nerve. For example, in a person with carpal tunnel syndrome where the median nerve is compressed at the wrist, Tinel's sign is often "positive" and causes tingling in the thumb, index, and middle fingers.

fracture of his left ankle, he fails to demonstrate that he cannot "ambulate effectively." Simmons relies largely on the portion of the report authored by Karmen Wolverton, who stated that Simmons has standing tolerances of 30 minutes, that he exhibited "unsafe behavior with balance activities including balance on raised surfaces," and that he "ambulated with decreased stance time on the left lower extremity." (Tr. 138, 146). Yet, neither finding demonstrates a "very serious interference" with Simmons's ability to initiate, sustain, or complete activities, as is evidenced by Ms. Wolverton's ultimate conclusion that Simmons can perform light duty work. (Tr. 147). Furthermore, there is no reference to Simmons being required to use a hand-held device such as a cane or walker to assist his walking.

Simmons also points to Dr. Texada's testimony on March 29, 2001 during a deposition held on Simmons's worker's compensation claim. At that deposition, Dr. Texada testified that, on November 2, 1998, he released Simmons to light duty work and further advised him to avoid uneven ground, heights, and anything that would cause Simmons to have ankle pain. (Tr. 170). However, Dr. Texada's progress notes from November 2, 1998, contain no such restrictions and simply release Simmons to light duty work, stating that he had reached maximum medical improvement. (Tr. 74). This is consistent with the findings of Dr. Steiner, who reported that Simmons has a normal gait, except for a mild limp on the left side because of his ankle problem. Dr. Steiner further reported that Simmons lacks about 5 degrees of full extension in his left ankle but otherwise has good range of motion, and that he can "function at light duty that [doesn't] require significant education." (Tr. 87-89).

Considering the foregoing, the undersigned concludes that the ALJ did not err in concluding that Simmons does not meet the requirements of Listing 1.03.

3.      **"Upper Extremity Impairment"**

Simmons also contends that the ALJ erroneously failed to conclude that his left hand impairment equals a listing. Simons fails to identify which listing he allegedly satisfies.

The undersigned concludes that this claim is without merit. Simmons was last insured for disability benefits on September 30, 1999, and the injury to his left hand did not occur until March 14, 2000. Therefore, even if the ALJ had concluded that Simmons's left hand impairment is disabling *per se*, Simmons still would not be entitled to benefits because he fails to show that this condition existed prior to the expiration of his disability benefits.

Second, the undersigned concludes that the medical evidence does not establish that Simmons's left hand impairment is disabling, either alone or in combination with his left ankle impairment. The record shows that no examining physician has opined that Simmons's hand injury will prevent him from working. Indeed, Dr. Texada, Dr. Steiner, and Dr. Genoff, as well as Ms. Wolverton, all note that, despite his left hand injury and its attendant pain, Simmons is capable of performing light work. Therefore, this claim is without merit.

4.      **Physical Therapy**

Simmons also contends that the ALJ erred in noting that he failed to obtain physical therapy to improve his ability to stand and walk or to go to vocational training, arguing that no examining physician ever recommended therapy or vocational training. The record shows that this argument is factually incorrect. On March 31, 1998, Dr. Texada stated that Simmons was ready for vocational rehabilitation, (Tr. 74), while Karmen Wolverton recommended that Simmons "participate in some sort of exercise/conditioning program to improve overall physical condition including active movement of his left ankle" on October 20-22, 1998. (Tr. 129). The

record shows that Simmons did not engage in either activity. Considering the foregoing, it was proper for the ALJ to consider such evidence in concluding that Simmons failed to comply with prescribed treatment. Accordingly, this claim is without merit.

**5.**    **Residual Functional Capacity**

Finally, Simmons contends that the ALJ erred in concluding that Simmons is able to perform the full range of light work and in stating that he can eventually return to medium level work.

The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity. <u>Perez v. Heckler</u>, 777 F.2d 298, 302 (5th Cir. 1985). After consideration of the record and the briefs, the undersigned concludes that the evidence in record supports the ALJ's residual functional capacity assessment. Dr. Texada, Simmons's treating physician, released him to light duty work on November 2, 1998 following two successful surgeries for his left ankle fracture. (Tr. 74). The FCE evaluation performed by Ms. Wolverton similarly reported that Simmons can perform light duty work, (Tr. 147), as did Dr. Steiner. (Tr. 89). All of these examiners released Simmons to light duty work despite knowing of and acknowledging that he will continue to experience some pain and tenderness in both his left ankle and left hand.

Light work involves lifting no more than 20 lbs. at a time with frequent lifting or carrying of objects weighing up to 10 lbs. Ms. Wolverton found that Simmons reached safe maximums of 30 lbs. with bilateral lifting from floor to shoulder level, (Tr. 125-39), which is consistent with the ALJ's finding. Considering the foregoing, the undersigned concludes that the ALJ's

assessment of Simmons's residual functional capacity was not erroneous.

*Conclusion*

Considering the foregoing, it is recommended that the ALJ's decision be **AFFIRMED.**

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) days from receipt of this Report and Recommendation to file specific, written objections with the Clerk of Court.  Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge at the time of filing.

Any judgment entered herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).  See Richard v. Sullivan, 955 F.2d 354 (5th Cir. 1992) and Shalala v. Schaefer, 509 U.S. 292 (1993).

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir.  1996).**

Signed at Lafayette, Louisiana, on October 11, 2005.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)